# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AFFYMAX, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 04 C 6216 |
| ) | |
| JOHNSON & JOHNSON, ORTHO ) | |
| MCNEIL PHARMACEUTICAL, ) | |
| INC., ORTHO PHARMACEUTICAL ) | |
| CORPORATION, THE R.W. JOHNSON ) | |
| PHARMACEUTICAL RESEARCH ) | |
| INSTITUTE, JOHNSON & JOHNSON ) | |
| PHARMACEUTICAL RESEARCH & ) | |
| DEVELOPMENT, L.L.C., and DOES 1-10, ) | |
| ) | |
| Defendants. ) | |

## CORRECTED
## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Affymax, Inc. has sued multiple defendants for claims arising out of the scientific research they jointly conducted for the purpose of discovering various peptide compounds with pharmaceutical applications.[1] Relevant to the motion at hand, Affymax has sued Ortho-McNeil Pharmaceutical Corp. (OMN) to correct inventorship and ownership of patents under 35 U.S.C. § 256 and for corresponding declaratory and injunctive relief under 28 U.S.C. §§ 2201-02. It has also sued Johnson & Johnson Pharmaceutical Research & Development L.L.C. (PRD) for breach of contract and unjust enrichment. OMN and PRD have counterclaimed against Affymax, seeking a declaratory judgment that Affymax's claims are subject to arbitration and an injunction

---

[1] A peptide is "any of various natural or synthetic compounds containing two or more amino acids linked by the carboxyl group of one amino acid to the amino group of another." Dictionary.com, http://dictionary.reference.com/search?q=peptide (last visited Feb. 28, 2006).

against further litigation of a related lawsuit pending in Germany. They also demand the correction of inventorship and ownership of certain patents and make claims for breach of contract, breach of fiduciary duty, unjust enrichment, and constructive trust. OMN and PRD have moved to compel arbitration of Affymax's claims and to enjoin the German lawsuit. For the following reasons, the Court grants defendants' motion.

**Facts**

Affymax is a drug discovery and development company that, among other things, creates peptide drugs for the treatment of various health conditions. Johnson & Johnson is a health care products company based in New Brunswick, New Jersey. OMN, which was formerly known as Ortho Pharmaceutical Corporation (OPC), is a wholly owned subsidiary of Johnson & Johnson. PRD is a wholly owned subsidiary of OMN.

In 1992, Affymax and the R.W. Johnson Pharmaceutical Research Institute (PRI), an unincorporated division of OPC, signed a contract called the R&D Agreement in which they agreed to conduct joint research to develop peptide compounds. The contract provided that inventions created in connection with the research were the property of the creating party, with joint inventions to be jointly owned, and it required each party to make available information in its possession necessary for the filing of patent applications and to comply with certain confidentiality obligations. The agreement also included a provision that mandated arbitration of "any controversy or claim arising out of or relating to [the] Agreement" in accordance with the laws of California. Def. Reply, Ex. 1 ¶8.1.

Between 1992 and 1995, Affymax performed research and invented numerous products pursuant to the R&D Agreement and filed United States, European, and international patent

2

applications based on those inventions. Affymax provided copies and drafts of the applications to PRI before filing them. On June 7, 1995, the same day that Affymax filed two of its own applications, OPC filed Patent Cooperation Treaty (PCT) and United States patent applications that Affymax contends were based on the information it had disclosed to PRI. The PCT patent application formed the basis of several foreign patent applications, including one in Europe that remains pending.

In 1997, OPC merged with McNeil Pharmaceuticals and became OMN. On June 16, 1998, the United States Patent Office issued patent number 5,767,078 (the '078 patent), naming OMN scientists as the inventors. The patent was issued based on OPC's June 7, 1995 applications. In 2001, pursuant to paragraph 7.1 of the R&D Agreement, OMN assigned its rights and obligations under the Agreement to its wholly owned affiliate, PRD. The provision of the Agreement allowing assignment reads as follows:

> [E]ither party may extend or transfer all or any portion of its rights and obligations hereunder to any of its Affiliates that shall agree to be bound by the provisions hereof relating to the assigned rights with the same effect as if it were named as herein but the assignor shall continue to be responsible for performance by such Affiliate of its obligations hereunder. Subject to the foregoing provisions of this Section 7, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

Def. Reply, Ex. 1 ¶7.1.

On June 9, 2004, Affymax filed a "vindication action" in German courts, a lawsuit – similar to this one – in which Affymax demanded ownership of OMN's European patent application. The German suit stayed prosecution of the patent until ownership issues are resolved. On September 23, 2004, Affymax filed this lawsuit, asserting patent claims against OMN and breach of contract claims against PRD. In response, the defendants have asked the

3

Court to compel arbitration of Affymax's claims. OMN also asks the Court to enjoin Affymax from pursuing its lawsuit in Germany.

## Discussion

**1.    Arbitration of claims**

Before a court may compel arbitration, it must determine "that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Paine Webber, Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990). "Whether the parties have agreed to arbitrate is a question normally answered by the court rather than by an arbitrator."[2] *Continental Cas. Co. v. Am. Nat. Ins. Co.*, 417 F.3d 727, 730 (7th Cir. 2005). To determine whether the parties have agreed to arbitrate a certain matter, "federal courts generally should rely on state contract law governing the formation of contracts." *James v. McDonald's Corp.*, 417 F.3d 672, 677 (7th Cir. 2005).

Affymax concedes that it must arbitrate its breach of contract claim against PRD, but it contends that it is not required to arbitrate its patent claims against OMN because PRI – not OMN or OPC – originally signed the agreement. Pl. Resp. at 1. An unincorporated division like PRI, however, has no separate legal existence apart from its parent corporation. *See Western Beef, Inc. v. Compton Inv. Co.*, 611 F.2d 587, 591 (5th Cir. 1980) ("'A division of a corporation is not a separate legal entity but is the corporation itself'") (quoting *In re Sugar Indus. Antitrust Litigation*, 579 F.2d 13, 18 (3d Cir. 1978)). Consequently, when Affymax and PRI signed the R&D Agreement in 1992, OPC (OMN's predecessor) was a party to the Agreement and assumed

---

[2] The parties do not contend that the issue of arbitrability should be resolved in the first instance by the arbitrator.

its resulting rights and obligations.³ *See Gen. Dynamics Corp. v. United States*, 47 Fed. Cl. 514, 525 (Fed. Cl. 2000) (holding legally inconsequential the fact that name of unincorporated division was appended to name of corporation signing a contract); *Judson Pacific-Murphy Corp. v. Durkee*, 144 Cal. App. 2d 377, 383, 301 P.2d 97 (1956) (holding that corporation – not the unincorporated division named on the contract – was party responsible for performance).

Affymax's second contention is that OMN cannot compel arbitration because it assigned away its arbitration right. In response, OMN concedes that it assigned the agreement to its wholly owned affiliate, PRD, and that an assignment ordinarily extinguishes the right to compel arbitration. *See, e.g., McCown v. Spencer*, 8 Cal. App. 3d 216, 225, 87 Cal. Rptr. 213, 219 (1970) ("An assignor may not maintain an action upon a claim after making an absolute assignment of it to another."). It nevertheless maintains that paragraph 7.1 of the Agreement did not authorize an unconditional assignment of rights. *See* Def. Reply at 5.

The Court agrees that under paragraph 7.1, OMN retained certain rights and obligations after it assigned the agreement to PRD. As quoted above, and as OMN suggests in its brief, paragraph 7.1 made OMN responsible for PRD's future performance. *See* Def. Reply, Ex. 1 ¶7.1 ("the assignor shall continue to be responsible for performance by such Affiliate of its obligations hereunder."). By assuming this responsibility, OMN also retained a correlative right, namely, the right to have claims against PRD submitted to arbitration. The Agreement's

---

³ Affymax, in arguing that it never agreed to arbitrate disputes with OPC or OMN, insists that "[w]hereas the law might dictate who may enforce certain contractual obligations, it is the contract that defines the scope of rights and obligations themselves. . . . Affymax at most agreed to arbitrate with Ortho certain disputes arising between Affymax and PRI." Pl. Sur-Reply at 5. The Court agrees that Affymax did not agree to arbitrate any and all disputes with OPC and OMN. This does not alter the fact, however, that OPC was a party to the original agreement.

arbitration clause is worded broadly; it requires arbitration of "any controversy or claim arising out of or relating to [the] Agreement." Under this provision, any claim relating to the Agreement, including a claim that calls paragraph 7.1 into play, is subject to arbitration. *See Kvaerner ASA v. Bank of Tokyo-Mitsubishi Ltd*, 210 F.3d 262, 265-66 (4th Cir. 2000) (holding that party was entitled to arbitration where guarantee contract incorporated rights, including right to arbitration, available under the original contract).

Having determined that the R&D Agreement requires arbitration of at least some claims between Affymax and OMN, the Court considers whether Affymax's suit seeks to hold OMN responsible for PRD's performance. In resolving that question, the Court is mindful of the presumption favoring arbitrability. *Miller v. Flume,* 139 F.3d 1130, 1136 (7th Cir. 1998) ("[O]nce it is clear the parties have a contract that provides for arbitration of some issues between them, any doubts concerning the scope of the arbitration clause are resolved in favor of arbitration."). The issue, though it involves patent claims, is governed by regional circuit law. *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1349 (Fed. Cir. 2002).

Affymax's patent claims against OMN and its breach of contract claims against PRD are effectively indistinguishable. The claims are premised on the same set of facts, the gravamen of both being that the wrong inventors and owners are listed on the relevant patents. *See* Amend. Comp. ¶¶1-25. The claims also seek the same relief, correction of inventorship and ownership, and they create a dispute that arises out of the R&D Agreement. Indeed, section four of the Agreement states that "[a]ny inventions made by either party . . . shall be the property of the party making the invention." Given the similarity of the claims and the fact that they are both rooted in

the subject matter of the R&D Agreement, the Court has no trouble finding that Affymax's claims against OMN effectively attempt to hold it responsible for PRD's performance. For these reasons, the claims are subject to arbitration under the R&D Agreement.

It makes little difference that Affymax has brought its claims under the patent laws. Courts routinely hold that statutory claims that relate to an agreement requiring arbitration are subject to arbitration even when they are not specifically contemplated by the terms of the contract. *See, e.g., Oblix, Inc. v. Winiecki*, 374 F.3d 488, 490 (7th Cir. 2004) (holding that Title VII claim subject to arbitration under terms of employment agreement which required parties to arbitrate, "any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement."); *cf.* 35 U.S.C. § 294(a) ("A contract involving a patent or any right under a patent may contain a provision requiring arbitration of any dispute relating to patent validity or infringement arising under the contract."). In the end, regardless of whether Affymax's claims are brought under statutory or common law, they fall within the scope of the arbitration clause, because they seek to hold OMN responsible for PRD's failure to change the inventors and owners listed on certain patents.

Affymax also argues that OMN's proposed contract construction would result in the absurd result that "Entity A could assign rights to Entity B, who could in turn assign rights to Entity C, and the result would be that each of the parties – A, B, and C – would simultaneously possess all the same rights in the agreement." *See* Pl. Sur-Reply at 4. The short response to this argument is that there is little absurdity in holding parties to their agreement. When OMN assigned its rights under the contract to PRD, Affymax retained the right to sue OMN for PRD's failure to perform, and OMN retained the right to arbitrate those suits. Compelling arbitration in

this case only gives effect to the parties' bargain.

Finally, the Court notes that Affymax's German claims seek a subset of the relief that Affymax seeks in this case: correction of the inventors listed on certain European patents. Def. Reply, Ex. 3 at 2. For the reasons discussed above, they also fall within the scope of the arbitration clause.

### 2. Equitable estoppel

Even if OMN was not a party to the R&D Agreement or had completely assigned its arbitration rights to PRD, OMN could still compel arbitration of Affymax's claims. Though a party cannot ordinarily compel arbitration unless it is a party to a contract with an arbitration clause, the Seventh Circuit has recognized limited exceptions to this rule. *See, e.g., Zurich Am. Ins. Co. v. Watts Indus., Inc.,* 417 F.3d 682, 688 (7th Cir. 2005) (stating that third party beneficiary can compel arbitration); *Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp.*, 659 F.2d 836, 838 (7th Cir. 1981). One such exception, based on a theory of equitable estoppel, allows a nonsignatory to compel arbitration when a signatory's claims are grounded in or intertwined with the terms of the written agreement. *See Hughes Masonry*, 659 F.3d at 688. This doctrine recognizes that it would be unfair to allow a plaintiff to "'rely on the contract when it works to its advantage, and repudiate it when it works to (its) disadvantage'" *Id.* at 839 (quoting *Tepper Realty Co. v. Mosaic Tile Co.*, 259 F. Supp. 688, 692 (S.D.N.Y. 1966).

In *Hughes*, the plaintiff-contractor attempted to avoid arbitration of its claims against a construction manager for intentional and negligent interference with contract, arguing that the manager was not a signatory to a construction agreement. *Id.* at 838. The court rejected the contractor's argument and said that it had "merely attempted to characterize alleged failures to

8

perform various construction management duties (or their improper performance) as tortious interferences with its contractual relations." *Id.* at 840. The court held that the claims had to be submitted to arbitration because they were grounded in the construction manager's alleged breach of its obligations under the agreement. *Id.* at 839.

As far as the Court can tell, the Seventh Circuit has not recently revisited the issue of equitable estoppel as it applies to arbitration agreements, but other circuits, including the Second, Fourth, Fifth, and Eleventh, have reaffirmed the doctrine's continuing validity. *See JLM Indus. Inc. v. Stolt-Nielsen S.A.*, 387 F.3d 163, 177-78 (2d Cir. 2004); *In re Humana Inc. Managed Care Litigation*, 285 F.3d 971, 974-75 (11th Cir. 2002); *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527-28 (5th Cir. 2000); *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320-21 (4th Cir. 1988). These courts have held that equitable estoppel is proper in two different circumstances: when the signatory relies on the terms of the written agreement in asserting its claims against the nonsignatory, and when the signatory raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. *See Grigson*, 210 F.3d at 527 (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999).

In *JLM Industries*, the plaintiffs were in the business of shipping, buying, and trading chemicals in bulk. 387 F.3d at 167. They entered into individual shipping transactions with the defendants, owners and subsidiaries of shipping companies, and they signed standard form contracts that included an arbitration clause. *Id.* The plaintiffs sued the defendants for conspiring to inflate shipping prices in violation of the antitrust laws. *Id.* at 168. The plaintiffs sought to avoid arbitration of the owners' claims by arguing that the shipping contracts had only

9

been signed by the subsidiaries. *Id.* at 177. The court rejected the plaintiffs' argument and said that equitable estoppel required arbitration, because the plaintiffs' entry into the contracts containing allegedly inflated price terms was what gave rise to the claimed injury. *Id.* at 178.

By contrast, in *Brantley v. Republic Mortgage Ins. Co.*, 424 F.3d 392, 396 (4th Cir. 2005), the plaintiffs were home buyers who sued their mortgage insurer for increasing their insurance premiums based on information contained in their consumer credit reports. Plaintiffs complained that this practice violated provisions of the Fair Credit Reporting Act. *Id.* at 394. The defendants moved to compel arbitration on equitable estoppel grounds, arguing that the plaintiffs' mortgage contained an arbitration clause. *Id.* at 395. The court held that the plaintiffs' lawsuit was not sufficiently related to the contract to require arbitration; it noted that the lawsuit concerned mortgage insurance premiums and not the underlying mortgage contract itself. *Id.* at 396.

In this case, Affymax's complaint makes several references the R&D Agreement. In particular, Count 1, which incorporates the general allegations of the complaint and is directed at OMN, alleges that the Agreement required the parties to exchange information concerning their peptide research and to keep confidential any information disclosed by the other party. *See* Am. Comp. ¶12. It also alleges that OMN – in violation of the Agreement and the patent laws – obtained patents based on that confidential information. *Id.* ¶19. The Court concludes that, as in *JML Industries*, Affymax's reliance on the R&D Agreement is sufficient to effect an estoppel.[4]

Affymax argues that it would still have a viable patent claim if the parties had conducted

---

[4] *JML Industries*, which held that equitable estoppel required arbitration of plaintiffs' claims under the Sherman Act, contradicts Affymax's argument that equitable estoppel is inappropriate when claims are based on federal statutes.

the same joint research without the benefit of an R&D Agreement. On this point, *JML Industries* is instructive. In that case, the plaintiffs' antitrust allegations depended not so much on the contracts the parties signed but rather on the shipping prices the owners charged. Nevertheless, the court said that equitable estoppel was proper because the plaintiffs' entry into the contracts gave rise to the claimed injury. So too here, Affymax may have had viable claims against OMN had the parties acted without the benefit of a contract, but the reality is that information changed hands and confidentiality requirements were imposed because the parties entered into the R&D Agreement.

Affymax also argues that the only relationship between its claims and the R&D Agreement is that this dispute would not have arisen "but for" the Agreement. *See* Sur-Reply at 7. Citing *Brantley*, Affymax argues that this relationship is insufficient to merit equitable estoppel. The Court rejects this argument. In *Brantley*, the plaintiffs' claims were related to their mortgage agreement only insofar as the mortgage agreement caused the plaintiffs to buy mortgage insurance. No provision of the mortgage agreement had any other significance in resolving the plaintiffs' claims. By contrast, Affymax has asserted as part of its patent claim that it has an ownership right in the confidential information it supplied OMN. That ownership right as well as the reason for supplying the confidential information are outlined in the R&D Agreement. For these reasons, the R&D Agreement was more than a "but for cause" of the parties' dispute, and equitable estoppel is proper.

### 3. Anti-suit injunction

In addition to an order compelling arbitration, OMN seeks an injunction preventing Affymax from pursuing its vindication action in Germany. A federal court's power to enjoin a

party from litigating in another country is well established. *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004). The Seventh Circuit has said that an anti-suit injunction is proper when allowing the two suits to proceed would be "gratuitously duplicative." *Allendale Mutual Ins. Co. v. Bull Data Sys.*, Inc., 10 F.3d 425, 431 (7th Cir. 1993). Other circuits have articulated the standard differently, stating that an anti-suit injunction should issue only if the parties are the same in both matters, the resolution of the case before the enjoining court is dispositive of the action to be enjoined, and the foreign action threatens the jurisdiction or the strong public policies of the enjoining forum. *See Laif X Sprl v. Axtel S.A.*, 390 F.3d 194, 199 (2d Cir. 2004); *Paramedics*, 369 F.3d at 652; *China Trade & Dev. Corp. v. M.V. Choong Yong*, 837 F.2d 33, 35-36 (2d Cir. 1987); *Laker Airways, Ltd. v Sabena Belgian World Airlines*, 731 F.2d 909, 926 (D.C. Cir. 1984). Though the Seventh Circuit has said it "incline[s] toward the laxer standard," it has also noted that the differences between the two standards may be semantic and not substantive. *Phillips Med. Sys. Intl. B.V. v. Bruetman*, 8 F.3d 600, 605 (7th Cir. 1993).

In *Phillips Medical*, the district court entered a default judgment against the defendant after he repeatedly failed to comply with the court's orders. *Id.* at 603. It also ordered the defendant to deposit in the court certain bills of exchange that it had received from the purchase of medical equipment. *Id.* at 604. The defendant argued that the order effectively enjoined a foreign lawsuit, because the bills were held in an Argentine court and the only way he could obtain them was by voluntarily dismissing the Argentine suit. *Id.* The Seventh Circuit held the order was proper, recognizing that even under the stricter standard followed by other circuits, an anti-suit injunction was necessary to give effect to a district court's judgment. *Id.* at 605. The

12

court dismissed concerns of international comity, stating, "If Argentina cares that [the defendant] is unable to defend against [the plaintiff's] suit in an Argentine court, we should expect to hear from either our State Department or the foreign office of Argentina." *Id.*

In *Allendale*, the defendants lost one hundred million dollars worth of computer inventory in a fire in one of its warehouses. 10 F.3d at 427. The plaintiffs, the insurers of the defendant's inventory, sought a declaratory judgment that the cause of the fire was arson committed by the plaintiffs and that the loss was excluded from coverage. *Id.* After the plaintiffs filed suit in the Northern District of Illinois, the defendant sued one of the plaintiffs in a French commercial court. *Id.* The French suit was stayed pending a criminal investigation, but the stay was lifted after the defendants argued that the criminal investigation was on the verge of completion and would result in a conclusion that there had been no arson. *Id.* The Seventh Circuit approved a district court's injunction against the defendants' litigation in French court, reasoning that the French court – which was actually a panel of part-time arbitrators – was less equipped to do justice in the document intensive lawsuit and that duplicate litigation would unduly prejudice the plaintiffs. *Id.* at 430.

In *Paramedics*, the defendant distributed the plaintiff's medical products in Brazil under agreements that contained broad arbitration clauses. 369 F.3d at 649. In 2002, the plaintiff invoked the arbitration process, and the defendant responded with a lawsuit in Brazil and a petition in New York state court seeking a stay of the arbitration proceedings. *Id.* The plaintiffs removed to federal court and counterclaimed for an order to compel arbitration as well as an anti-suit injunction. *Id.* The district court issued the injunction, ruling that the Brazilian action fell within the scope of the arbitration clause and that the arbitration would be dispositive of the

issues in the Brazilian lawsuit. *Id.* at 650. The Second Circuit upheld the district court's ruling, recognizing the strong federal policy favoring the liberal enforcement of arbitration clauses and the district court's need to enforce its own judgments. *Id.* at 654-55. The court said that "where one court has already reached a judgment – on the same issues, involving the same parties – considerations of comity have diminished force." *Id.* at 654.

Synthesizing these cases, the Court concludes that the case for an anti-suit injunction is most compelling when a party seeks to both enforce a judgment and avoid duplicate litigation. An injunction in this case would achieve both goals. The Court has already ruled that the German dispute is subject to arbitration. As in *Paramedics*, the Court has a significant interest in enforcing that ruling, and an injunction preventing Affymax from going forward with the German lawsuit would allow the Court to do so. Also, if the Court did not issue an injunction, the German lawsuit and the arbitration would proceed simultaneously, resulting in the same unfair burden condemned in *Allendale* and *Paramedics*.

Affymax contends that this case is controlled by *Laif X Sprl*, 390 F.3d at 194. In that case, the plaintiff held shares in Axtel, a Mexican communications company. A dispute arose concerning whether the plaintiff or another company, Telinor, owned a majority of Axtel's shares. *Id.* at 197. The plaintiff initiated arbitration with Telinor pursuant to Axtel's bylaws. *Id.* Telinor answered plaintiff's arbitration demand and also filed a separate suit in Mexico. *Id.* Plaintiff then filed suit in the Southern District of New York, seeking to compel Telinor to arbitrate its claims and requesting an anti-suit injunction against Telinor's lawsuit in Mexico. *Id.* at 198. The district court declined to grant relief, and the Second Circuit affirmed. *Id.* at 200. It held that an order compelling arbitration was unnecessary because Telinor was already

participating in the arbitration and that an anti-suit injunction was improper because the arbitrator should be the first to determine whether the arbitration should be stayed in favor of the Mexican lawsuit. *Id.* at 199-200. Simply put, *Laif X Sprl* is inapposite because Affymax has not agreed to arbitrate its patent claims.

Affymax also argues that an anti-suit injunction should not issue because the German lawsuit provides it with unique relief not available in this Court, in any arbitration, or in any other court besides the one in Germany: namely, a stay of the European patent application. Pl. Resp. at 11-12. Though the European patent may issue during the pendency of arbitration, the patent's issuance would not be irreversible. The arbitrator could ultimately decide that OMN must, as Affymax requests, transfer its rights in the patent to Affymax and pay damages accordingly. Regardless, the potential issuance of a European patent does not change the fact that the legal issues in the two cases are the same and that resolution of the arbitration will be dispositive of the action in Germany. *See Phillips Medical*, 8 F.3d at 605; *Paramedics*, 369 F.3d at 653.

Affymax also points out that it will be irreparably harmed if the European patent issues, because "it would suggest to Affymax's potential partners, collaborators, investors, and customers – inaccurately – that individuals *other than* Affymax scientists invented the claimed subject matter and that an entity *other than* Affymax possesses the relevant ownership rights in Europe." Pl. Resp. at 11 (emphasis in original). Though Affymax cites no case law for the proposition that the risk of adverse business relations affects the propriety of an anti-suit injunction, the Court notes that Affymax's business partners likely had such suspicions long ago. By Affymax's own admission, a United States patent covering the same invention was issued to

15

OPC in 1998, and OPC filed numerous other patent applications all around the world. *See* Amend. Compl. ¶¶ 15, 20. It is unlikely that issuance of the European patent during the pendency of the arbitration proceedings will have a significant negative effect on Affymax's business relations above and beyond what the previous patents and patent applications have already caused.

### Conclusion

For the foregoing reasons, the Court grants defendants' motion to compel arbitration and to enjoin Affymax from pursuing further litigation in Germany related to the European patent application involved in this case [docket nos. 25-1 & 25-3]. Because of the potential for disputes arising from the arbitration that the Court will be required to resolve, and the potential for making a judicial determination following the arbitration, *see, e.g., Lloyd v. Hovensa, L.L.C.*, 369 F.3d 263, 270 (3d Cir. 2004); 35 U.S.C. § 256, the Court denies defendants' motion to dismiss the case [docket no. 25-2] and instead stays the case pending arbitration. The case is set for a status hearing on September 13, 2006 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 28, 2006